Street Surgery Center v. NLRB. Mr. Guevara. Yes. Good morning, Your Honors. Greg Guevara on behalf of the Respondent, Capital Street Surgery Center. May it please the Court. The lesson of this Court's decision in the Sears-Roebuck case is that the facts matter. To survive scrutiny, the Board's findings of fact must be supported by substantial evidence. The findings cannot be grounded in speculation or conjecture, they cannot stretch the evidence beyond reason, and they cannot simply disregard or discount evidence that supports a contrary view. Yet that's exactly what happened in this case, Your Honors. According to seven witnesses called by both the Respondent and the General Counsel, Mr. Louster had an extensive history of unprofessional conduct during patient procedures, including not paying attention or becoming easily distracted during surgeries, not anticipating the needs of the doctor, not listening to the doctor, not following the doctor's directions, squirting co-workers with saline, doodling on the scrub tray with markers, and poking nurses with his fingers, talking excessively, goofing around, carelessly dropping lines and other supplies, and not setting up the room correctly for standard procedures. On November 18, 2020, Lead Tech Lozano reported to Administrator Brandon Errett that Mr. Louster had set up the surgical field for a procedure incorrectly and that it had to be corrected while the patient was already on the table. Mr. Guevara? Yes, Your Honor. Kind of taking a step back, can we talk about standard of review? Yes. You argue that the court should not give any deference to the fact-finding of an LRB or the ALJ. And you make the argument, but I'm wondering, can you cite to any Supreme Court or Seventh Circuit law that would support such an argument? I cannot, Your Honor. What I can say is that there is board case law that suggests that it's appropriate to do a de novo review when there is no – the judge in this case, the ALJ, had no – decided the case on a paper record. And so we feel that that's why a de novo review would be appropriate. But, Your Honor, my entire argument today is based upon substantial evidence. Well, and the judge who presided at the trial when the witnesses actually testified did so virtually and then left the bench. Correct. Left the agency bench. That's correct. And that's why it was referred to another judge for a paper record review. Correct, Your Honor. I understood your argument to focus mostly on the credibility determinations that had been made by the successor ALJ. We did think those were significant, yes. And the case law gives great deference to credibility findings. And I understood the argument to encompass a subtler point about whether this is a substantial evidence case or a de novo review. Clearly, substantial evidence is the statutory standard of review. Right. And to fit your argument within the statutory framework for all agency review, it's a question of what level of deference is owed to credibility findings when they're made based on a paper record. Do they get the same sort of deference on steroids that a credibility finding with live witnesses and a judge in the same room would get, or do they get less than that? And I think that's a fine point, Your Honor. And the reality is in this instance that there were so many leaps of – jumps of speculation and conclusions that were just grounded one upon the other, and that's what I wanted to talk about, that specifically the judge just kept going and going and going and finding every single inference against the employer and just looked at the – just disregarded the testament. I just gave the example of the seven witnesses. Seven witnesses who testified about this long pattern of history, which created the context for the decision itself. When Mr. Arrett – when they came in and said, hey, he was messing around again. He's handling a flashlight during a procedure, which the judge said wasn't even – wasn't even an offense. It wasn't even an offense. He's handling an emergency flashlight. There's no clinical reason to do so. That's undisputed. There's no basis for – there's another group at the Sterile Processing Department that's responsible for actually managing those flashlights, and yet he's manipulating a flashlight while a procedure's on – while the patient's on the table, and he's pointing it toward a nurse who's monitoring the patient's vitals. So – We have a threshold problem before we even get to any of that about whether the decision maker here actually knew about the protected activity that he's demonstrated. And he did not. He did not, Your Honor. He did not know because the court – the judge found that he knew because he had, in a one sentence – he was asked the question, did you talk – did you find out about the – about what happened in the meeting? And he said, yes, I talked with Danielle Mahindra about the meeting. It was a two-hour inventory meeting. With how many agenda items? With 13 or 14. I don't remember. The last agenda item was the one. It was all about inventory. And he testified that he didn't know anything about what any of the specific text said in that meeting, certainly did not know anything about what Mr. Louster said in that meeting, and yet the judge specifically found that that testimony, even though it controverted his direct specific testimony, that that testimony was sufficient to establish that he knew that Mr. Louster had been the primary instigator. On that point specifically, the judge found that Mr. Louster – that he initiated the objection and that he said that a nurse operating the CRM would be illegal. That's false. That's not what the record says. What happens is Dr. Mahindra said, can Chelsea run the CRM? And Mr. Louster said, no, she's an RN. That's it. Then another IR tech says, actually, it would be illegal because that's the job of the IR techs. So Dr. Mahindra initiated the conversation, and another IR tech made the comment it would be illegal. The judge said that he did both of them, that Louster did both of those things, and that's why Mr. Ehret was motivated to terminate him based upon something that he didn't even know that the conversation had happened. Right, and I understand that, and this is a factual argument, but I have a predicate legal question about how it is that Mr. Louster's response to Dr. Mahindra's question about whether Chelsea could run the CRM where Mr. Louster says, no, she's an RN, constitutes protected activity as a legal matter under the statute. I know that was stipulated or agreed. I don't understand how it fits within the definition of concerted activities for mutual aid and protection of the employees. We didn't challenge that point at trial or at the board level, Your Honor. We're not challenging it here. In essence, if it were protected, there were multiple people in that meeting that had that same conversation and that talked about that topic. At the end of the day, the only person who was discharged was Mr. Louster, who had this extensive history of screwing around in the operating room and had one more report that that's what happened. That's what actually happened. With regard to Mr. Ehret's knowledge, I think in the transcript he did say that as a general matter when he was asked, well, when you're not at a meeting, don't delete IR tech's report, what happened at the meeting? And they asked him, well, do they also report the questions that came up in the meeting? He said, as a general matter, they do convey to me questions that came up during the meeting. Sure, and that may be a standard practice in a two-hour inventory meeting. And I guess my question is wouldn't the discussion with regard to the CR arm generally, and I know you're going to say it's not particularly Mr. Louster, but with regard to the questions that were raised during the CR arm, wouldn't you expect Mr. Ehret to at least be informed that, hey, you know, there's a question about this practice that you're proposing? I would think it could have happened. There wasn't testimony that it did. But I think the key, Your Honor, is that in order to create the motivation, the animus against Mr. Louster, Mr. Ehret would have needed to know that Mr. Louster was somehow in a different place than the rest of the IR techs in relation to this conversation. And the record doesn't reflect any differentiating factors that would put him at risk. What it does reflect is that – and the judge literally ignored the testimony of two neutral witnesses, two nurses who came in and said, he's highly distracting, it's very disruptive, he pokes us while we're trying to get our job done. And that's the context of what actually happened. And this is really ultimately about the surgery center's ability to protect its patients and to make decisions about what's in the best interest of its patients. So, Your Honor, I'm going to reserve the rest of my time. I've only got 45 seconds, so I'm going to hold that. Thank you. That's fine. Thank you. Mr. Seid. Good morning, Your Honor. May it please the Court, David Seid for the Labor Board. Substantial evidence supports the Board's finding that the company unlawfully discharged employer Louster. Before the court, the company has not shown that the record compels a different result. The company's argument relies primarily on discredited testimony while ignoring accredited testimony. It has not offered any basis to overturn the administrative law judge's very well-reasoned and very detailed credibility determinations that encompass almost three pages of his decision that were then reviewed de novo by the Board. With respect to the discharge, I do want to clarify a couple of points. First and foremost, the company acknowledged, and this is Administrator Earhart at Supplemental Appendix pages 91 and 93, that the basis for the reason he was discharged was allegedly making wall puppets with a flashlight. Very simply, the Board, based on the credited testimony, found that that incident simply did not exist. It's addressed in detail, obviously, in the Board's decision and in the Board's brief, but just very briefly, Nurse Phelue was reasonably credited as an existing employee who was testifying against the company's interest, that it simply did not happen and that it would have been too bright in the room for it to happen, and reasonably discredited Supervisor Lozano, whose testimony, quite frankly, was all over the place. She initially testified that the incident was so distracting and so bad that Mr. Louster actually left the CR machine and that Supervisor Mahindra had to step in and run it. She then acknowledged later on in her own testimony at Supplemental Appendix page 546 that she wasn't even sure that Supervisor Mahindra was even in the room at the time. And then when Supervisor Mahindra testified about the alleged incident, she couldn't recall any of the sort happening and didn't say anything about having to take over the CR machine. As far as Mr. Louster's overall work performance, very simply, again, the company— The question of Mr. Ehret's knowledge of the protected activity at issue here, which is the single comment by Mr. Louster in the two-hour meeting, answering Dr. Mahindra's question about whether Chelsea, the nurse, was authorized to run the CR. Your Honor, knowledge can be inferred from all of the factors. And here I would point out it wasn't just one comment, the no. He then proceeded to state that the nurse was not qualified to run it or wasn't licensed to run it. And then there was a third comment that was also made a little bit later on. But as far as inferring the knowledge, this was an item that Administrator Earhart himself, the morning of the meeting, placed on the agenda, and there were seven agenda items. This was agenda item number six that he very specifically, in the morning of the meeting, placed on the agenda that the nurse who is not licensed to run this machine would be running it instead of giving overtime to those who were qualified to run it. And the Board reasonably inferred, given Earhart's own testimony, that he is normally told what happens after the meetings, that he was specifically told about this meeting after the fact, that he would not be told anything about an agenda that he placed on the meeting that really led to quite an uproar and an opposition. But there was no competent evidence, no evidence at all, that he was told about what transpired on that particular agenda item. All we have is his testimony that, as a general matter, his representatives in meetings like this, the lead IT techs, report to him on what happens during meetings. That creates nothing more than speculation that that includes this particular agenda item when there's no affirmative evidence suggesting that he was aware and was, in fact, told about what Mr. Mouster had said. Your Honor, I respectfully disagree with the suggestion. This is simply speculation. It's a reasonable inference. Well, is there anything more than his general statement that my lead IT techs report to me about what happens during meetings? Do we have anything more than that? Well, that the supervisors report to him. He acknowledged getting reported to after this particular meeting, and he's the one that, the morning of the meeting, places on the agenda that employees are being called. Well, we understand, yes. It's clear that he put this item on the agenda, but there's no affirmative evidence that anybody told him what transpired on this agenda item. The inference that you're asking us to approve of that was drawn by the ALJ here, who didn't hear any of this testimony but decided the case on the paper record, that the inference rests solely on that general practice, that he's generally told what happens at meetings and that he did receive a report about this meeting. Nothing more than that supports this critical element of knowledge, which is essential to liability because the termination decision, the firing decision had to have been made because of his protected activity, that that was a substantial motivating factor. Your Honor, I understand the court's concern, but would simply, and I don't mean to be repetitive, but that simply because the two supervisors denied telling, and their denial wasn't simply that they didn't tell Administrator Erhard about the whole discussion that took place regarding unlicensed people using the CRM in overtime or the lack of overtime, but that they didn't even tell him anything, not a single word about this whole issue that he had placed on the agenda. And in that context, the Administrative Law Judges upheld by the Board very reasonably discredited that testimony and inferred that, come on, he must have told him something about this agenda item that he himself had placed on the meeting for that. Mr. Seed, could I tell you what gives me some pause in this case? We have to give substantial deference to the finding, but you've got a judge making credibility decisions off a written record. The judge who tried the case never issued an opinion, kind of an unusual situation. This isn't like a judge coming in in a criminal case where the judge tried the case and another judge does the sentencing because you have a unique separate hearing where that judge can make that kind of independent judgment, the second judge. Here, how much deference should we give to a judge who can't read the record any differently than I could read the record? Your Honor, I would simply direct the court to its decision, citing in the Board's brief, the Sue Products case, where the court recognized that though a determination of credibility was not based on demeanor, and it wasn't necessarily entitled to exceptional weight, the credibility determinations nonetheless should be upheld where the Administrative Law Judge did provide a basis and explanation for making those decisions. Again, there are almost three pages of the Administrative Law Judge's decision where he is exhaustively going through the testimony, pointing out the inconsistencies, drawing reasonable inferences, and ultimately deciding which testimony should be credited and which testimony should not be credited. That was certainly very reasonably done and the company has not shown any basis. How long did this hearing take? The hearing, Your Honor, I don't recall specifically how long it took. It's about a 700-page record. Well, how often do we confront a situation where the ALJ leaves the case and never issues an opinion, and then we're asked to look at the work of the second judge who just reads a cold record? I don't recall having faced such a case, but I'm sure there may have been one. Your Honor, I can't point to a specific case where a judge has left a case. This was a situation where apparently the judge left the agency, and that's why the judge was not able to write the decision. But as indicated in the Suit Products case, there are certainly situations where Administrative Law Judges issue opinion, where they make credibility determinations that are not based on demeanor. And again, while this Court has indicated they may not be entitled to great weight, as long as the judge and, as upheld by the Board, provide a reasonable explanation for those credibility determinations, they should be upheld. And that's certainly the case here where, again, there's multiple pages going through. Mr. Seed, I guess, you know, when I look at one of the things that gives me concern is that it seems like one reading could be the ALJ just, and I think the ALJ says this, basically says, I don't believe any of it. You know, he basically says, look, you know, from what I've seen, I don't believe anything that Earhart, Mohindra, or Lozano says. And he says that, and to some extent he doesn't address some of the key reasons that would be contrary to that, to his kind of overall analysis, right? So one of the things that Appellant's counsel points out is, you know, the various witnesses talk about Mr. Louster's prior record problems, the OR, including I think it's Ms. Hunter and Ms. Habert. And it seems to me that one can surmise that one of the reasons the ALJ didn't do it is because the ALJ made up his mind early on and said, you know what, I don't believe these folks, and so I'm not going to deal with everything, you know, the entire substance of your testimony. I'm just going to flat out disregard all of it. To me, that doesn't seem like a very reasoned opinion, particularly when the ALJ doesn't wrestle with directly contrary evidence. Your Honor, I see that my time is up. Two points. First, if the reason for the discharge simply did not happen, and again, it is absolutely undisputed in this case that Administrator Earhart made the decision to discharge employee Louster based on the alleged incident with the flashlight or making the puppets on the wall. If that didn't happen, the company can then not come back and say, well, there's really other reasons or other things that happened. And then also to just show really the just outright at times ridiculous testimony from the company witnesses is that Administrator Earhart claimed that Mr. Louster was put on a performance plan. But then at the hearing, he testifies at page 585 and 86, it wasn't put in writing, and Mr. Louster was never even informed that he was allegedly put on a performance plan. So it's testimony like that, and again, this Court should not engage in an over-review, but it's welcome to look at the entire record and just see time after time after time of company witnesses literally tripping over themselves with inconsistent stories and backing up on certain things that they say at one point. Like, again, with the wall puppet happening and then the very person who supposedly saw it basically claiming, well, it may not have really happened the way I said it happened. All right. Thank you very much. Thank you, Your Honor. The Court would simply ask that the Court enforce its order. Mr. Corbar. Your Honors, if anyone was tripping over themselves in this case, it was the ALJ to find literally every single credibility determination adverse to the company, adverse to seven different witnesses, including some called by the general counsel herself. Even the idea that he was given – Administrator Earhart testified that he had spoken with Mr. Louster repeatedly about these issues. Ms. Lozano and Ms. Mahindra had also spoken with him. So he was on notice. The judge said, well, he hadn't been given a formal written warning. Neither had the other two employees that were summarily terminated based upon safety violations. That's just the way the company did it, and there was nothing that required them to do it differently than that. He was an at-will employee. They made a business decision based upon what they felt was in the safety of their client, of their patients, and in the best interest of the company, and did not do so in a way that had anything at all to do with statements that Mr. Louster made about which Mr. Earhart knew nothing. We'd ask the order to be unenforced or not enforced, Your Honors. All right. Thank you very much. Our thanks to both counsel. The case is taken under advisement.